IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BALDWIN ENTERPRISES, INC.,     )
              )
            Plaintiff,    )
              )
vs.                    )    Case No. 09-cv-0159-MJR-PMF
              )
RETAIL VENTURES, INC.,       )
              )
           Defendant.   )

MEMORANDUM AND ORDER

REAGAN, District Judge:

        A.    Introduction

This lawsuit stems from a commercial lease agreement executed in 1973, an amendment to (*and guaranty of*) the lease agreement in 2000, and a multi-layered reorganization and merger in 2003. The crux of the case is whether, under the guaranty, the named Defendant in this action is liable to the named Plaintiff for unpaid rent and damages for breach of the lease.

Baldwin Enterprises filed this action in the Circuit Court of Bond County, Illinois, from which Retail Ventures, Incorporated removed the case to this Court one year ago. The removal notice properly identifies the basis for federal subject matter jurisdiction – the diversity statute, 28 U.S.C. § 1332.[1]

---

[1] Plaintiff's April 2009 amended complaint, filed in this Court, incorrectly states the bases for subject matter jurisdiction and venue (inadvertently repeating the allegations of Illinois jurisdiction and venue from the original complaint). But jurisdiction and venue do lie in this District.

The discovery deadline has elapsed.   The case is set for trial June 21, 2010, with a June 4, 2010 final pretrial conference.   The January 12, 2010 settlement conference was continued by the Honorable Philip M. Frazier, United States Magistrate Judge.   The case comes before this Court on timely cross-motions for summary judgment, which were fully briefed as of February 5, 2010.   For the reasons stated below, the Court denies Plaintiff's motion and partially grants/partially denies Defendant's cross-motion.

B.      Factual and Procedural Background[2]

In May 1993, an Illinois partnership named **CLEPA's** (as landlord) and a Missouri corporation named **Gramex Corporation** (as tenant) entered into a commercial lease agreement for a property located at 1400 East Route 40 in Greenville, Illinois ("the Lease").   The Lease had a 15-year term and obligated Gramex Corporation to pay annual base rent of $234,000 in 12 monthly installments of $21,175.

In November 1999, Value City Department Stores, Inc. ("**Value City**") purchased 100% of the common stock of Gramex Corporation.   Also on that date, Gramex Corporation assigned all of its rights and interest under the Lease to Gramex Retail Stores, Inc. ("**Gramex Retail**").   Gramex Retail assumed all the obligations and benefits of tenant

---

[2]      These undisputed facts are taken from the documents attached to the pleadings.   The lease, the amendment and the guaranty are attached to the amended complaint at Doc. 24. Unfortunately but understandably, the briefs interchange or mis-state the names of the various contracting parties at certain points (Gramex Corporation vs. Gramex Retail Stores, Inc.; CLEPA's vs. Baldwin).   The Court has endeavored to sort out the who's-who in this Order.

Gramex Corporation under the lease.  *See* Assignment at Doc. 24-3, p. 34.

On May 23, 2000, two documents central to this litigation were executed. First,  CLEPA's (as landlord) and Gramex Retail (as tenant) executed an Amended Lease. Second, Value City executed a Guaranty of Lease, whereby Value City guaranteed Gramex Retail's performance of obligations under the Amended Lease.   Sometime after the Amended Lease and Guaranty were executed, Baldwin Enterprises, Inc. ("**Baldwin**") acquired all interest in CLEPA's, explaining why Baldwin is the named Plaintiff herein.

In October 2003, Value City underwent a corporate reorganization.  The record contains a tangle of allegations and attestations about what happened in that reorganization.  Carefully scrutinized, the record reveals that Value City became a wholly-owned subsidiary of Retail Ventures, Inc. ("**RVI**").  Specifically (as described more fully below) via a transaction known as a triangular merger, Value City  merged into *a subsidiary of* RVI (as opposed to merging directly *with* RVI).   The consequences of that merger are at issue here.

In April 2008, the leased premises were abandoned, allegedly leaving rent owed, real estate taxes unpaid, and the parking lot in a state of extreme disrepair.  The ultimate question is whether RVI is liable to Baldwin for the alleged breach (via the Guaranty executed by Value City).  Baldwin says yes, contending that RVI assumed the liabilities of Value City.  RVI says no, maintaining that the October 2003 reorganization left Value City intact as a corporation with its own liabilities and did *not* render RVI the guarantor under the Guaranty executed by Value City.

In January 2009, Baldwin sued RVI in Illinois state court.  Baldwin alleged that Gramex Retail abandoned the premises and defaulted on the lease, that Value City had guaranteed performance of all lease covenants, and that RVI continued the previous business activity of (and succeeded to the obligations of) Value City, thereby rendering RVI liable to Baldwin for unpaid rent of roughly $128,000, repair costs of about $84,000, real estate taxes of $113,000, plus interest, attorney's fees and costs of this action.

RVI removed the case to the United States District Court in February 2009. Baldwin amended its complaint in April 2009.  The amended complaint contains two counts.   Both counts allege breach of the Guaranty.

Count I proceeds on a theory of successor liability (against RVI  as successor to Value City).  Count II alleges that the Court should pierce the corporate veil of Value City (to impose liability against Value City's alter-ego, RVI).

Baldwin moved for partial summary judgment on the issue of RVI's successor liability (Count I) on November 30, 2009.  RVI timely opposed Baldwin's motion and cross-moved for summary judgment on January 4, 2010.  The motions were fully briefed February 5, 2010.  With that factual and procedural overview, the Court turns to the standards governing analysis of the pending motions.

C.      Applicable Legal Standards

Summary judgment is appropriate where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.  *Turner v. The Saloon, Ltd.*, – F.3d –, 2010 WL 424580, *3 (7th Cir. Feb. 8, 2010); *Durable Mfg. Co. v.*

4

*U.S. Department of Labor*, 578 F.3d 497, 501 (7th Cir.  2009), *citing* FED. R. CIV. P. 56(c). *Accord Levy v. Minnesota Life Ins. Co.*, 517 F.3d 519 (7th Cir. 2008)*; Breneisen v. Motorola, Inc.*, 512 F.3d 972 (7th Cir. 2008), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

        In ruling on a summary judgment motion, this Court must view in the light most favorable to the nonmovant the evidence plus all inferences reasonably drawn from the evidence. *Reget v. City of La Crosse*, – F.3d –, 2010 WL 424581 (7th Cir. Feb. 8, 2010); *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 630 (7th Cir. 2007).

        When cross-motions for summary judgment are filed, "we look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Diaz v. Prudential Ins. Co. of America*, 499 F.3d 640, 643 (7th Cir. 2007).  As the United States Court of Appeals for the Seventh Circuit has explained,  on cross-motions for summary judgment, the Court must construe "the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Durable*, 578 F.3d at 501, *citing Rickher v. Home Depot., Inc.*, 535 F.3d 661, 664 (7th Cir. 2008).  *Accord Jefferson v. United States*, 546 F.3d 477, 480 (7th Cir. 2008).

        And when the nonmoving party bears the burden of proof, he must demonstrate the existence of a genuine fact issue to defeat summary judgment. *Reget,* 2010 WL 424581, \*2.  That is, the non-movant must provide evidence on which the jury or court could find in his favor.  *See Maclin v. SBC Ameritech*, 520 F.3d 781, 786 (7th Cir. 2008).

D.   <u>Analysis</u>

The central question here is whether Defendant RVI is the guarantor of obligations under the Amended Lease and, therefore, on the hook for damages from any breach of the lease terms.  RVI is not *named* as the guarantor in the Guaranty.  The first paragraph of the Guaranty reads (Doc. 24-3, p. 1):

> THIS GUARANTY OF LEASE ... is entered into this 23rd day of May 2000, by and between **Value City Department Stores, Inc**., an Ohio corporation (Guarantor), and **CLEPA's**, an Illinois partnership (Landlord).

Plainly then, RVI has no *direct liability* under the express terms of the Guaranty, and the Court tackles the thornier issue of whether RVI has *successor liability*. That depends on what the 2003 reorganization of Value City did to the relationship between RVI and Value City.

Under Illinois law, the mere transfer of assets from one corporation to another does not make the latter liable for the liabilities of the former.  *Consolidated Services and Const., Inc. v. S.R. McGuire Builder*, **854 N.E.2d 715, 720 (Ill. App. 2006).** Illinois recognizes four exceptions to this general rule, however, and imposes successor liability where:   (1) an express or implied assumption of the obligations occurred; (2) the transaction amounted to a merger of the seller and buyer or a consolidation of the two; (3) the buyer is a mere continuation of the seller; or (4) the transaction is fraudulent in that it was entered into just to allow the seller to escape its liabilities.  *Id.*   As to Count I, Baldwin argues that RVI is Value City's successor and thus liable (via the Guaranty) under three of these theories.

First, Baldwin asserts that successor liability should be imposed against RVI, because RVI expressly or impliedly agreed to assume Value City's liabilities. Baldwin supports this assertion with a statement included in a filing made with the Securities and Exchange Commission under Rule 414 of the Securities Act of 1993.[3]   Second, Baldwin argues that RVI was a mere continuation of Value City, as the continuity of stock ownership shows.  Third and alternatively, Baldwin contends that there was a de facto merger of RVI and Value City (based on, *inter alia*, the continuity of stock ownership and the identity of shareholders before and after the 2003 Value City reorganization).[4]

As to the second and third arguments, Baldwin stresses the following points regarding the 2003 reorganization.  The capital stock of RVI had the same designations, rights and preferences as the capital stock of Value City prior to reorganization.  Each share of common stock of Value City was converted into and exchanged for one share of common stock of RVI.  The holders of common shares of Value City became holders of an

---

[3]   Rule 414 provides, *in part*, that the registration statement of a predecessor issuer shall be deemed the registration statement of the successor issuer, provided the succession was effected by a merger or similar succession under which the successor acquired all assets and assumed all liabilities and obligations of the predecessor.  Pointing to RVI's statement that it "as successor issuer to Value City" adopts Value City's registration statement as its own, Baldwin asserts that "RVI must have assumed" all liabilities and obligations of Value City.  *See* Doc. 31, p. 8 & attachments.

[4]   The fourth basis for liability was not argued by Baldwin in support of summary judgment on Count I (*see* Docs. 31, p. 11) but arose in subsequent briefs.

identical number of common shares of RVI.  Substantially all the shareholders of Value City prior to the reorganization were the same shareholders of RVI after the reorganization.  And a database search for the ticker "RVI" generates a search result with the words "formerly Value City Department Stores, Inc."  *See* Doc. 31, pp. 3-5.

On Baldwin's summary judgment motion, the Court views the evidence and all reasonable inferences in the light most favorable to RVI.  So construed, the evidence does not support the grant of Baldwin's motion.

To the contrary, the record before this Court establishes that RVI did not expressly or impliedly assume the lease/guaranty obligations.  The actual merger documents solidly rebut the assertion that RVI assumed Value City's liabilities, and Baldwin misunderstands the SEC Rule concerning a successor issuer's adoption of a predecessor issuer's registration statement and omitted a portion of the rule pertinent to the reorganization at issue herein.  RVI corrected and clarified this to the Court's satisfaction.  ***See* Doc. 34, pp. 10-11, quoting 17 C.F.R. 230.414.**

Moreover, the 2003 reorganization was not a merger or consolidation or de facto merger of Value City and RVI.  ( Rather, RVI was formed as the parent company to Value City, and the Guaranty does not extend to parent companies of Value City.)  Finally, RVI was not a "mere continuation" of Value City, and the 2003 reorganization was not structured to allow RVI to fraudulently duck its liabilities.

RVI submitted a December 2009 declaration made under penalty of perjury and a December 2008 sworn affidavit from James A. McGrady, RVI's Chief Financial

Officer since its inception as an Ohio corporation.  *See* Exhibit A to Doc. 34.  McGrady explained in detail the 2003 corporate reorganization at issue herein, including the following facts key to the restructuring.

①      Value City Department Stores, Inc. (referred to in this Order as "Value City") was a full-line, value-price retailer of apparel, accessories, home furnishings, electronics and seasonal items.

②      In early 2003, RVI was incorporated as a direct, wholly-owned subsidiary of Value City.

③      RVI was a holding company operating retail stores in two segments – Filene's Basement, Inc. and DSW, Inc.  DSW operates shoe stores in 37 states.  Filene's Basement operates 36 retail stores in major metropolitan areas of the Northeast and Midwest United States.

④      In July 2003, Value City Merger Sub, Inc. ("Merger Sub") was incorporated as one of several direct wholly-owned subsidiaries of RVI.

⑤      In August 2003, Merger Sub merged into Value City. Through this merger, RVI received newly-issued common shares of Value City in exchange for all the common shares of Merger Sub held by RVI.  All of RVI's common shares that were owned by Value City were canceled. The outstanding common shares of Value City (i.e., the public shares) were converted into and exchanged for common shares of RVI.

⑥      After the 2003 reorganization, Value City remained a separate and distinct corporate entity that continued to maintain its own assets and liabilities.

McGrady further outlined subsequent corporate transactions and developments which need not be discussed in detail to sort out the motions now before the

Court.[5]   What emerges from the labyrinth of corporate history before this Court is that the 2003 reorganization was not a  merger or consolidation of *RVI and Value City.*  Instead, what happened was this.

Value City formed RVI (a holding company).  Next RVI had several entities incorporated as its wholly-owned subsidiaries.  One of those was Merger Sub, Inc. ("Merger Sub").  **Merger Sub then merged with and *into* Value City.**  The transaction left Value City intact as a corporate entity with its own assets and liabilities.  The transaction did not relieve Value City of its obligations as guarantor of the lease with Baldwin.

The merger agreements and corporate filings involved in the 2003 reorganization (part of the substantial record before the undersigned Judge) corroborate the McGrady declaration and affidavit.  They indicate that the 2003 reorganization left Value City  intact as a corporation, with RVI as the parent and Value City as the subsidiary.

RVI did not merge with Value City.  RVI did not acquire Value City.  RVI was formed in a manner that left Value City standing.  Yes, Value City's stock now was held by RVI rather than the former shareholders.  But Value City remained a corporate entity

---

[5]     The following points bear mention.  In December 2004, Value City Department Stores Inc. (simply called "Value City" in this Order) restructured again,  merging with and into Value City Department Stores LLC (referred to herein as "VLLC").  In January 2008, RVI (who had held 100% of the investment in Value City) disposed of an 81% ownership interest in its Value City business to a newly created entity – VCHI Acquisition Co.   In October 2008, several companies, including Gramex Retail, VLLC and VCHI Acquisition Co. filed for Chapter 11 bankruptcy protection.

with its own assets and liabilities (including obligations under the Guaranty).  Counsel have identified, and this Court has located, no provision of the Guaranty which prevented Value City from reorganizing as it did. Nor has Baldwin identified any provision of the Guaranty which extended or shifted Value City's obligations to its parent companies, holding companies or shareholders.

So the record before the Court does not support Baldwin's various arguments for summary judgment on Count I – that RVI is liable as *successor* to Value City by merger, that RVI expressly or impliedly assumed Value City's liabilities, that RVI was the mere continuation of Value City, or that RVI and Value City underwent a de facto merger.  Value City continued to operate as a separate business and did *not* cease all operations after the 2003 reorganization.  Value City became a wholly owned subsidiary of RVI, but Value City was not stripped of its assets and did not fold.  Value City continued to exist and continued to have its own obligations, such as those under the Guaranty.

Although this maneuvering may appear improper at first blush, caselaw reveals that triangular mergers and reverse triangular mergers (*see* footnote 6 below) are recognized, accepted, and fairly routine. The United States Court of Appeals for the Ninth Circuit has defined a triangular merger as: "a statutory merger of a 'target' corporation ... into an acquiring corporation, with the acquiring corporation using its parent's stock." *Giovanini v. United States*, **9 F.3d 783, 784 n.6 (9th Cir. 1993).**

The United States District Court for the Eastern District of Michigan (citing a Colorado District Court opinion) described these transactions as popular and legitimate:

11

The transaction structure, used here to affect a corporate reorganization, is not uncommon.  The reverse triangular merger is popular precisely because it allows the acquiring company ... to gain control of the target ... without actually merging with the target or risking its own assets on the target's liabilities.  *See, e.g., Kaufmann v. LVA Holdings, Inc.,* No. 05-cv-2140, 2006 U.S. Dist. LEXIS 49499 at *2 (D. Colo. Oct. 22, 2008) ("**The recognized purpose of this type of merger agreement is to avoid successor liability which would be the consequence of a direct merger of two constituent corporations. [It] is an artful but lawful dodge**....").

*Saginaw Property, LLC v. Value City Department Stores, LLC,* – F. Supp. 2d –, slip copy, **2009 WL 3536616, *8 (E.D. Mich. Oct. 30, 2009), emphasis added.**

Similarly, in *Morgan v. Powe Timber Co.,* **367 F. Supp. 2d 1032 (S.D. Miss. 2005)**, the Court explained:

The transaction at issue ... is a standard method of acquisition in which a target corporation ... becomes a wholly-owned subsidiary of a parent corporation ... without any change in its corporate existence.

Such transactions, known as "triangular mergers," are "common and have a myriad of legitimate justifications."  ...

A triangular merger permits A, the acquiring company, to acquire control of T, the target company, *without A being a constituent corporation*, by forming a new ... subsidiary (S) into which T is merged....  The advantage of this type of merger is that T will become a wholly-owned subsidiary of A without any change in its corporate existence....  **Thus, the rights and obligations of T, the   acquired corporation, are not transferred, assumed or affected.**

*Morgan* **at 1037-38, emph. added,** *citing Binder v. Bristol-Myers Squibb, Co.,* **184 F. Supp. 2d 762, 772 (N.D. Ill. 2001).**

Fletcher Cyclopedia of the Law of Corporations reiterates some of the advantages of triangular mergers mentioned in the above-referenced cases.

> Sometimes, it is desirable to have the target corporation merge into a subsidiary of the acquiring corporation rather than into the acquiring corporation itself. **This may be useful if the acquiring corporation wishes to avoid direct exposure to the liabilities of the target corporation** or if the merger of the target corporation into the acquiring corporation is prohibited by applicable law. A triangular merger involves such a merger and produces a parent-subsidiary controlled group of corporations with the subsidiary owning the target corporation's assets, as well as any assets of its own.

**14A Fletcher Cyc. Corp. § 7011 (2009), emph. added.**

The transaction at issue herein is more properly characterized as a *reverse triangular merger*, one kind of triangular merger.[6]   A reverse triangular merger also produces a parent-subsidiary controlled group with the acquiring corporation as the parent, but the subsidiary of the acquiring corporation merges *into the target* in this form of reorganization.  **14A Fletcher Cyc. Corp. § 70.11.30.**  Reverse triangular mergers are useful if the target corporation has valuable franchises or licenses that cannot be readily transferred.  ***Id.***  Reverse triangular mergers also may qualify for tax benefits if they meet certain requirements.  ***Id.***

---

[6]    In a triangular merger, the acquiring company (A) takes control of the target company (T) by forming a new subsidiary (S), and then T merges into S (with S surviving). In a *reverse* triangular merger, the same events occur except that S merges into T (leaving T surviving).  ***See Morgan*, 367 F. Supp. 2d at 1038.**

13

Stated simply, a triangular merger allows an acquiring company to avoid successor liability by leaving a surviving subsidiary intact, thereby *not* taking on the target corporation's obligations.   As the Northern District of California has elaborated:

> a "reverse triangular merger" of the sort performed here (merger of the target with a specially formed subsidiary of the acquirer, which then becomes the sole shareholder of the newly merged subsidiary), does not effect a "de facto" merger unless the transaction has been structured to disadvantage creditors or shareholders.

*In re McKesson HBOC, Inc. Securities Litig.*, 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000).

In an unreported decision from this District Court, the Honorable J. Phil Gilbert carefully examined a triangular merger akin to the one in the case *sub judice*. In *Cima v. Wellpoint Health Networks, Inc.*, 2008 WL 4671707 (S.D. Ill. 2008), the defendant had created a wholly owned subsidiary for the purpose of merging with a target corporation. The target corporation became the subsidiary, and the defendant became the parent.

Judge Gilbert expressed doubt that this transaction would impose successor liability on the defendant/parent, remarking that plaintiffs had neither pointed to a provision of the merger under which defendant assumed the obligations in question nor identified any provision of law that would impose such liability on defendant. *Id.* at *2.

*Saginaw Property* is even more factually parallel to the case at bar. *Saginaw Property* actually involved the same underlying corporate events at issue in the instant case – the 2003 restructuring of Value City (as well as the subsequent reorganizations and

14

sales referenced in the parties' briefs, mentioned in footnote 5 above).

*Saginaw Property* is not binding on the undersigned Judge.  It is a District Court opinion from another Circuit, and the Judge was analyzing a different lease and guaranty, involving property located in Michigan, and applying Michigan law.  By contrast, the case at bar involves a lease and guaranty on a parcel of Illinois property.[7]

But resolution of both cases centers on the effect of the Value City 2003 reorganization, so *Saginaw Property* – though not controlling – is instructive.  And, on the motions and on record before it, this Court concludes (as Judge Ludington did four months ago in *Saginaw Property*) that the 2003 reorganization did not abolish Value City, dissolve Value City, or liquidate Value City.  Value City became a wholly owned subsidiary of RVI, but Value City still existed.  It continued to operate, it was not stripped of its assets, and it was not relieved of its obligations under the Guaranty.  Furthermore, there is no evidence in the record before this Court that the triangular merger was employed to *fraudulently* escape liability or to defraud shareholders.

For these reasons, Baldwin's arguments for summary judgment on Count I fail.  The Court must deny Baldwin's motion for partial summary judgment (Doc. 30) and

---

[7]     The *Saginaw* Court applied Michigan law to interpret the contract before it (noting that the parties there had not raised a choice of law issue but impliedly relied on Michigan law). Here, the Lease and Guaranty call for the application of Illinois law.  *See* Doc. 24-1, p. 19; Doc. 24-3, p. 3.  And the merger plan and agreement involving Value City, RVI and Merger Sub states that Ohio law governs.  *See* Doc. 13-4, p. 5.

15

grant RVI's cross-motion for summary judgment on that claim (**Count I** – breach of lease guaranty based on successor liability).  Which leaves RVI's cross-motion for summary judgment on **Count II** – breach of lease guaranty based on piercing the corporate veil.

Count II can be summarized as follows.  RVI exercised substantial or complete control over the administration and management of Value City after the 2003 reorganization.  RVI and Value City shared the same principal offices, management, directors, and assets after the reorganization.  RVI's control over Value City was so complete that Value City had no existence of its own post-reorganization.  RVI is merely the alter-ego of post-reorganization Value City, so the Court must pierce the corporate veil to un-do the unfair consequences of the 2003 reorganization.

Count II also alleges that piercing the corporate veil is warranted, because RVI stripped valuable assets of Value City through a *series* of reorganizations, mergers and spin-offs designed to allow RVI to avoid its obligations.  In rejecting Baldwin's claim for successor liability (ruling against Baldwin on Count I), this Court found the record devoid of evidence that *the 2003 reorganization* – the reverse triangular merger – was designed to disadvantage shareholders or defraud creditors.  The Court rejected Baldwin's argument that RVI was the mere continuation of Value City following the 2003 reorganization.  The Court emphasized that Value City was not reduced to an empty shell and that Value City remained intact as a subsidiary of RVI.  Moreover, Value City retained assets and continued to operate its own subsidiary companies (including Filene's and DSW) after the 2003 reorganization.

16

All this led the Court to conclude that RVI was not liable as Value City's successor to obligations under the Guaranty.   But Count II goes further.   It alleges that RVI stripped pre-reorganization Value City of valuable assets through a *series of several reorganizations*, mergers and spin-offs.   The materials before the Court indicate that the "series of transactions"   referenced by Baldwin in Count II (Doc. 24, p. 11) include a December 2004 Value City reorganization (a merger with Value City Department Stores, LLC or "VLLC"), VLLC's disposition of assets in January 2005, and the January 2008 sale of VLLC.

Baldwin has not moved for summary judgment on Count II.  RVI has moved for summary judgment on Count II, but RVI has not met its burden of proof as to that count.  Nearly all of RVI's lengthy brief (Doc. 34) and extensive supporting materials relate to the question of successor liability alone (Count I).

Unlike the detailed argument and citation to legal authority offered to defeat Baldwin's successor liability claim, Doc. 34 contains nearly no argument or cases supporting summary judgment for RVI on the piercing-the-veil claim.  Indeed, Doc. 34 suggests that RVI was not really *attempting* to address the issue of piercing the corporate veil.   In discussing successor liability, RVI referred to the well-established principle that a parent corporation typically is not liable for the actions of its subsidiary, even a wholly-owned subsidiary, and then stated (Doc. 34, p. 12, emph. added):

> The only type of exception to this general rule is a **"piercing the corporate veil" theory** <u>**which has not been raised by Baldwin in this case.**</u>   In order to pierce a subsidiary's

17

corporate veil to hold the parent liable, there needs to be an exercise of control over the subsidiary in such a manner as to commit a fraud or illegal ct....

Since fraud is not an issue here, RVI could not be held liable for the obligations of [Value City].

But Baldwin *has* raised a claim of piercing the corporate veil in Count II.  RVI may have misconstrued the fact Baldwin did not seek summary judgment on that ground as meaning that Baldwin did not have a claim based on that theory of liability.

RVI has demonstrated an absence of genuine issues of material fact and an entitlement to judgment as a matter of law on the successor liability claim (Count I).  But RVI clearly has not made that showing as to Count II.   So the Court must deny RVI's motion to the extent it seeks judgment on Count II.

E.    <u>Conclusion</u>

No genuine issues of material fact remain, and RVI is entitled to judgment as a matter of law on Baldwin's successor liability claim (Count I).

The Court **DENIES** Baldwin's motion for partial summary judgment (Doc. 30).  The Court **GRANTS in part** and **DENIES in part** RVI's cross-motion for summary judgment (Doc. 37).  RVI's motion is granted as to Count I and denied as to Count II.

At the close of this case, the Clerk of Court **SHALL ENTER JUDGMENT** in favor of RVI and against Baldwin on Count I (the successor liability claim).  Remaining for

18

disposition is Count II of the amended complaint – the breach of lease guaranty claim predicated on a theory of piercing the corporate veil.

IT IS SO ORDERED.

DATED February 18, 2010.

s/ Michael J. Reagan
Michael J. Reagan
United States District Judge

19